No. 01-022

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 1

E. H. OFTEDAL AND SONS, INC., a Montana

corporation with its principal place of business

in Miles City,

Plaintiff and Appellant,

v.

THE STATE OF MONTANA, ACTING BY AND THROUGH

THE MONTANA TRANSPORTATION COMMISSION

AND THE MONTANA DEPARTMENT OF TRANSPORTA-

TION, with its principal place of business in Helena,

Defendant and Respondent.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

Honorable Thomas C. Honzel, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Ronald G. Schmidt, Schmidt, Schroyer & Moreno, Pierre,

South Dakota

Patrick E. Melby, Luxan Murfitt, Helena, Montana

For Respondent:

Timothy W. Reardon and Stephen Garrison, Department of

Transportation, Helena, Montana

Submitted on Briefs: May 17, 2001
Decided: January 14, 2002

Filed:

_____

Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 E. H. Oftedal and Sons, Inc. (Oftedal) brought this action in the First Judicial District, Lewis and Clark County, seeking an upward revision of the contract sum on a federal-aid highway project, because of an error in its submitted bid. Oftedal initially sought relief from the Montana Transportation Commission (Commission) by requesting either the withdrawal of the bid or an upward revision to reflect the amount of the error. After the Commission's denial of Oftedal's request, Oftedal sought equitable relief from the District Court pursuant to § 28-2-1611, et seq., MCA. The parties agreed that no issues of material fact existed and that the matter would be appropriate for summary judgment upon presentation of stipulated facts and documents. The parties submitted cross-motions for summary judgment, and on September 25, 2000, the District Court entered its order denying summary judgment to Oftedal and granting summary judgment to the State. Oftedal subsequently filed a Rule 59, M.R.Civ.P., Motion to Alter or Amend Judgment, and on November 29, 2000, the District Court denied Oftedal's motion. On appeal, Oftedal requests this Court to reverse the decision of the District Court and order the District Court to effect an upward revision of the executed contract to reflect the amount of Oftedal's error, and to order specific enforcement of the contract as so revised.

¶2 We reverse the District Court's grant of summary judgment to the State and denial of summary judgment to Oftedal.

## BACKGROUND

¶3 Pursuant to authority granted in § 60-2-111, MCA, the Montana Department of Transportation (MDT) advertised for sealed bids for federal-aid highway project No. PLH-STPS-CT314-1(13)32-Northern Cheyenne Border-North (project). MDT prepared all forms for the proposal, which the stipulated documents refer to as the Bid Package. The Bid Package informed each bidder that the successful bidder would have to pay a portion of the total contract amount to the Tribal Employment Rights Office of the Northern Cheyenne Tribe, an assessment known as a "TERO" tax.

¶4 On August 19, 1999, Oftedal and two other bidders, in response to the invitation for bids, submitted sealed bids for the project to MDT. Pursuant to §§ 18-1-201 and -202, MCA, MDT must, as a condition precedent to considering such bids, require that each bidder submit bid security in the amount of 10 percent of the bid price as an indemnity against the bidder's failure or refusal to enter into any written contract that may be awarded upon or following the acceptance of the bid. Oftedal complied by furnishing an appropriate corporate bid bond. On August 19, 1999, the bids were opened and publicly read. A representative of Oftedal was present and heard the total dollar amount of each submitted bid, as well as MDT's own estimate for the project. Oftedal's bid was in the amount of $7,818,265.98, which was $1,419,207.00 (15 percent) lower than MDT's engineer's estimate of construction costs of the project, $1,277,882.00 lower than the second lowest bidder, and $1,545,749.00 less than the third bidder.

¶5 After the bid opening, Oftedal's officers and employees, including its estimator, Cameron Lundby, suspected mistakes. Lundby reviewed the bid but could find no error and so advised management, which relied upon his review. Lundby, immediately following the August 19 bid opening, had numerous other company duties and obligations as well as personal family concerns which required that he be absent from the state from August 24 through August 31, 1999. During this same time, Lundby was also the project manager for two major Wyoming highway reconstruction projects, was procuring work at an Idaho mine, procuring trucking work on a federal highway project in Yellowstone Park, and preparing a bid for a complex project for the Bonneville Power Administration. Lundby was the only Oftedal employee who had worked on this bid and was capable of

reviewing the bid for errors.

¶6 On September 1, 1999, the Commission met and voted to award the project to Oftedal. As of that date, Oftedal had not advised MDT or the Commission of any problems with its bid, and neither had MDT contacted Oftedal about the bid since the bid opening. On that same day, MDT mailed a written notice to Oftedal that it had been awarded the project, which included four copies of the contract for the project, as well as written explanation of the insurance and bonding requirements.

¶7 After Oftedal received notice of the award, Lundby began converting the bid to a computerized project budget, and during this process discovered the following bidding errors, as indicated in the parties' stipulation:

> 1. The select surfacing item was bid as an embankment item instead of a gravel item. The bid work sheets, true copies of which have at all times been in the possession of the MDT, disclose that Oftedal did not include any money in the bid for a pug mill operation, the necessary compaction equipment, or the hauling and compaction of additional material equal to the moisture added at the pug mill. Oftedal's additional cost for this work is $483,000;
>
> 2. Oftedal omitted the 3% TERO tax to be paid to the Northern Cheyenne Tribe for work on the Reservation. The cost of this tax is $234,500;
>
> 3. Oftedal's estimator did not save the cost entered for crushing the cover material grade4A which resulted in the estimating software reverting to the cost of zero. The cost of this crushing is $44,500; and
>
> 4. Oftedal's estimator did not update the price of diesel fuel for this estimate which resulted in underestimating this cost by $.17 per gallon. This fuel cost would be $27,000.

If Oftedal had not made these errors, the bid would have been in the sum of $8,607,265.98, $789,000 higher than the actual bid. If the contract amount was revised upward to reflect Oftedal's errors, Oftedal's revised bid would still be the low bid for this project by $428,625.33.

¶8 Immediately upon discovery of these errors on September 2, 1999, Lundby called

MDT's Chief Engineer at its Billings office, Myron Wilson, to inform him of the errors and, in his absence, left him a message. Wilson returned Lundby's call on September 3, 1999, and referred Lundby to Craig Favero, MDT's engineering project manager, to discuss alternative construction methods to mitigate Oftedal's mistakes. MDT's engineers could not determine any construction method to mitigate Oftedal's mistakes.

¶9 On September 7, 1999, Lundby discussed the mistakes and opinions of MDT's engineers with Oftedal's president, Bill Oftedal, and comptroller, Ray James. Oftedal's officers concluded that their only option was to request withdrawal of the bid and directed Lundby to immediately write a letter to MDT requesting withdrawal. The letter was mailed and faxed to Favero that same day, and was forwarded to the Commission on September 9, 1999. On September 16, the Commission met and denied Oftedal's request to withdraw its bid, even though one of the commissioners noted that Oftedal's mistake would have appeared obvious when the bids were opened. The Commission then gave notice that Oftedal had twenty calendar days from the date of award to execute and return the contract or the Commission would require forfeiture of Oftedal's bid bond in the amount of $781,826.60.

¶10 After the Commission's denial of Oftedal's request to withdraw its bid, Oftedal wrote MDT on September 20, 1999, requesting an upward revision of its bid to reflect the mistakes. The letter further stated that, under the threat of forfeiting its substantial bid bond, Oftedal would have no choice but to sign the contract under protest with reservation of rights to litigate this matter should the Commission not grant the requested relief.

¶11 Oftedal again wrote MDT the next day, September 21, 1999, requesting that the Commission, in addition to considering an upward revision of the bid amount, reconsider Oftedal's previous request to withdraw its bid, based upon Paragraph F of MDT's bid proposal form, entitled REVISION OF BID, which provides:

> In submitting this bid, bidder agrees that it waives any right or ability to claim, request or receive any upward revision of this bid without the express written consent of the Department and in accordance with the standard specifications. If bidder discovers a material mistake in its bid (factual mistake, not judgmental), it understands and agrees that it may either perform the contract as originally bid, or else bidder understands and agrees that it may request the Transportation Commission for permission to withdraw its bid. It is agreed that the Commission will review the request to determine if a mistake occurred, was material and factual,

and whether the bid should be allowed to be withdrawn.

¶12 The Commission met on September 22, 1999, and rejected Oftedal's request to rescind the award without forfeiture of the bid bond and award the project to the second low bidder, and further rejected Oftedal's request to modify and revise the contract sum upward to reflect the inadvertent mistakes, and enter a contract accordingly. Present at this meeting was chief counsel for MDT, who agreed that it was obvious that Oftedal had made a mistake and further, that Oftedal did not intend to make the mistake. Also present at the meeting was the Division Deputy Administrator of the Federal Highway Administration (FHWA) who informed the Commission that, if the Commission released Oftedal from its bid without forfeiting its bid bond, FHWA would not allow federal money to be used for any increased cost to MDT over and above Oftedal's original bid. This was a consideration in the Commission's denial of Oftedal's request. Oftedal then signed a contract, under protest, for the amount originally bid and initiated this action.

### ISSUE

¶13 Whether the District Court erred in denying equitable relief to Oftedal pursuant to § 28-2-1611, et seq., MCA.

### DISCUSSION

¶14 This Court reviews an order granting summary judgment *de novo*. *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21 (citations omitted). We review the facts presented to the district court to determine whether, based on Rule 56, M.R.Civ.P., the prevailing party is entitled to judgment as a matter of law. *Gentry v. Douglas Hereford Ranch,* 1998 MT 182, ¶ 23, 290 Mont. 126, ¶ 23, 962 P.2d 1205, ¶ 23 (citation omitted).

¶15 Section 28-2-1611, MCA, provides:

> **When written contract may be revised by court.** When, through fraud or a mutual mistake of the parties or a mistake of one party while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons in good faith and for value.

Section 28-2-409, MCA, provides:

> **What constitutes mistake of fact.** Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
> (1) an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract; . . .

Section 28-2-1612, MCA, provides:

> **Presumption that parties intended equitable agreement.** For the purpose of revising a contract, it must be presumed that all the parties thereto intended to make an equitable and conscientious agreement.

Section 28-2-1613, MCA, provides:

> **Scope of court's inquiry.** In revising a written instrument, the court may inquire what the instrument was intended to mean and what were intended to be its legal consequences and is not confined to the inquiry what the language of the instrument was intended to be.

¶16 As a preliminary matter, we note the State's argument that § 28-2-1611, MCA, is generic, applying to contracts in general, but that the statute has no application to public works contracts. The State contends that the competitive bidding statutes in Title 60 are applicable here and determinative of the issues Oftedal has raised.

¶17 We agree with the State that there is a difference between public works contracts and other contracts, and that public works contracts are let in accordance with Title 60. Competitive bidding statutes are primarily intended for the benefit of the public rather than for the benefit or enrichment of bidders, and consideration of advantages or disadvantages to bidders must be secondary to the general welfare of the public. *Baker v. State* (1985), 218 Mont. 235, 239, 707 P.2d 20, 23; *Stuewe v. Hindson* (1912), 44 Mont. 429, 437, 120 P. 485, 487. *Also see* 64 Am. Jur. 2d *Public Works and Contracts* § 82 (1972) (statutes for letting of public contracts are enacted for the benefit of the public and should be carried out with the sole reference to the public interest, and accordingly the rights of bidders must always be held subordinate to that interest).

¶18 However, that the competitive bidding statutes were established for the benefit of the public rather than to establish the rights of bidders does not necessarily exempt public contracts from fundamental contract analysis, or remedies at law or in equity provided by other statutes. Nothing in the competitive bidding statutes places public contracts somehow out of reach of the equitable relief provided by § 28-2-1611, MCA, if a party otherwise qualifies for such relief under the terms of the statute.

¶19 Further, the public bidding statutes and contract modification statutes are not inherently inconsistent. "It is good statutory construction law that where one part of the law deals with a subject in general and comprehensive terms, while another part of it deals in a more minute and definite way, the two parts should be read together and, if possible, harmonized, with a view to giving effect to a consistent legislative policy." Section 1-2-101, MCA; *Schuman v. Bestrom* (1985), 214 Mont. 410, 415, 693 P.2d 536, 538-39; *City of Butte v. Industrial Accident Board* (1916), 52 Mont. 75, 156 P. 130; *Stadler v. City of Helena* (1912), 46 Mont. 128, 127 P. 454. As § 28-2-1611, et seq., MCA, does not conflict with the public contracting process set forth in § 60-2-110, et seq., MCA, we conclude that § 28-2-1611, et seq., MCA, can be applied to public contracts.

## A. Contract Formation

¶20 Oftedal argues that the District Court erred by concluding that Oftedal did not give timely notice of the mistakes prior to the award, as opposed to prior to the "written contract," as referenced in § 28-2-1611, MCA. The District Court found, even in light of the MDT commissioner's comment that Oftedal's mistakes would have appeared obvious at the bid opening, that the Commission was not aware of, nor should it have suspected, Oftedal's mistakes when it awarded the project. The District Court concluded, therefore, that MDT could not "at that time, know or suspect" that the contract did not truly express the intention of the parties, as required for relief under § 28-2-1611, MCA.

¶21 Oftedal contends that it gave a timely, good faith notice of its mistakes immediately upon discovery, which was the day that the Notice of Award was received, and approximately twenty days prior to the deadline for executing a written contract. Oftedal argues that a contract was not formed by the Commission's award of the project, and therefore, it gave timely notice of its mistake prior to the formation of the project contract, and thus, MDT did "know at the time" of Oftedal's errors.

¶22 The State replies that, for public contracts, a contract is created when the project is

"awarded" rather than at the execution of the written instrument and that, for MDT to "know at the time" as required by § 28-2-1611, MCA, MDT was required to know of Oftedal's mistake prior to the award. The State contends that our decision in *Baker v. State*, *supra*, is controlling on the question of formation of public contracts. Thus, the State argues that, even if § 28-2-1611, MCA, does apply to public contracts, the conditions required under that statute for judicial modification upon unilateral mistake have not been met, as MDT neither knew or suspected the mistake prior to the formation of the contract.

¶23 To support its contention, the State points to dicta in *Baker*, which states that "[t]he advertisement for bids is not an offer which by acceptance constitutes a contract. It is merely an invitation to every bidder to make an offer, which the board may accept, and a contract result . . ." *Baker*, 218 Mont. at 239-40, 707 P.2d at 23 (citing *Stuewe*, 44 Mont. at 436, 120 P. at 487). The State argues for a broad interpretation of *Baker*, contending that this language confirms that contracts are always formed at the award of the contract, the execution being merely a memorial of the agreement.

¶24 However, in *Baker* we did not squarely address the question of whether or what kind of contractual relationship is formed immediately *after* the award of the contract and *prior* to the execution of the written instrument. *Baker* merely demonstrates that an invitation for bids is not itself an offer, but merely an invitation to make an offer. *See also Peerless Food Products, Inc. v. State of Washington* (1992), 119 Wn.2d 584, 595, 835 P.2d 1012, 1017; 64 Am. Jur. 2d *Public Works and Contracts* § 53 (1972) (stating "[t]he advertisement, being nothing more than a solicitation of bids or proposals for doing the work or furnishing the materials, does not of itself impose any contractual obligation"). Thus, the holding in *Baker* does not support the State's argument that a binding contract is necessarily formed at the acceptance of a low bidder's bid. We are faced with that precise issue here, and must define the rights acquired by each party upon *award* to Oftedal of the project, as well as upon *execution* of the written instrument after the award, as the answer to these questions will be determinative of the applicability of § 28-2-1611, MCA.

¶25 In support of its argument that no contract is formed prior to the execution of the written instrument, Oftedal notes two provisions under the project's Specifications and Contract Provisions (Specifications), provided in the Bid Package. First, Oftedal contends that the award is conditional based upon § 103.07 of the Specifications, which provides:

> EXECUTION AND APPROVAL OF CONTRACT. Return to the Depart-ment within 20 calendar days after receipt of the contract documents:

> A. The signed Contract;
>
> B. The contract bond;
>
> C. A copy of the insurance policy or a certificate of insurance;
>
> D. A copy of the current special fuel users permit issued under 15-70-302 MCA.

A proposal will not be binding unless all the above requirements have been satisfied.

> Do not begin work before:
>
> A. The Contract is executed;
>
> B. Contract bond is completed;
>
> C. Evidence of the required insurance is provided.

The Contract, bond, and insurance are subject to legal approval after execution by the Contractor and Surety.

¶26 Second, Oftedal notes that § 103.04 of the Specifications allows the Commission to cancel the award of the contract at any time prior to the execution of the written instrument. Section 103.04 provides:

> CANCELLATION OF AWARD. The award of the Contract may be canceled at any time before the execution of the Contract by all parties without liability against the Department.

¶27 Based upon the above provisions, Oftedal contends that the District Court's conclusion that Oftedal's mistakes had to be discovered and the Commission notified prior to the award, rather than prior to the execution of the contract, is erroneous as a matter of law.

¶28 The State, in further support of its argument that the contract was formed at the "award" rather than at the execution of the written instrument, cites to the District Court

order of November 29, 2000, denying Oftedal's motion to alter or amend. The District Court noted that various requirements take effect immediately after the award by the Commission. First, Oftedal was required to return to the MDT within twenty days the signed contract pursuant to § 103.07 of the Specifications. Second, § 18-1-204(1), MCA, specifically requires that if the bidder refuses to enter into a written contract after the award, the bidder shall forfeit its bid security. For these reasons the District Court required Oftedal to prove that the Commission had knowledge of the mistake prior to the award rather than prior to signing the written contract to fall within the parameters of § 28-2-1611, MCA.

¶29 It is a matter of some division in various state jurisdictions whether a public contract is formed at the time when the project is awarded, or whether the contract is formed only upon executing the written instrument. Often the determination is heavily fact dependent. As stated by the Supreme Court of Alaska in *State of Alaska v. Johnson* (Alaska 1989), 779 P.2d 778, "[t]he numerous cases dealing with the awarding of public contracts do not establish a bright line rule as to how and when a public body accepts a bid and becomes bound. Much of the divergence in the case law is due to the varying statutes and bid invitations. The statutes and bid invitation documents constitute the primary guidelines for the parties and the court." *Johnson*, 779 P.2d at 780 (holding that the statutes, bid documents, and notification letter taken together, could not lead to the reasonable belief that the State had exhausted its discretion to reject the bid and re-let the contract).

¶30 In *Johnson v. City of Jordan* (Minn. App. 1984), 352 N.W.2d 500, the Court of Appeals held that a contract was formed immediately at the award of the contract because no discretion remained in the city or its officials to withdraw after the award. The City of Jordan advertised for bids and included a written contract with the materials provided to potential bidders. Appellant Johnson was the low bidder and was awarded the contract. Soon thereafter, the city council rejected its first award and awarded the contract to the second low bidder. Johnson petitioned for a writ of mandamus, requesting that the District Court order the City of Jordan to execute the contract between itself and Johnson.

¶31 The Court of Appeals found that the issue of whether a contract had been entered by the award was "subject to the intent of the parties." *City of Jordan*, 352 N.W.2d at 503. The Court held that the drafting of a written contract and its attachment to the proposal, thereby becoming part of the request for bids, was sufficient to indicate an intent to enter into such a formal contract, and constituted an objective manifestation of final acceptance by the City, finding "[t]here was no discretion remaining in the city or its officials to deny

the contract . . . ." *City of Jordan*, 352 N.W.2d at 503 (emphasis supplied).

¶32 In so holding, the Court of Appeals recognized that a contract need not always form at the award, citing to *1 Williston on Contracts*, § 31 (3d ed. 1957):

> In the case of public contracts, the requirement of certain formalities by law or by the request for bids, *such as a written contract*, or the furnishing of a bond, often indicates that even after acceptance of the bid no contract is formed until the requisite formality has been complied with.

*City of Jordan, 352 N.W.2d at 503 (emphasis supplied).*

¶33 Further, the Court held that the requirement of a bid bond does not determine the issue, distinguishing bid bonds from performance bonds, and noting that the purpose of the bid bond "is to guarantee the making of a contract by the successful bidder, and in case of his failure to do so, to indemnify the municipality for the damages and expenses sustained or incurred thereby. . . ." *City of Jordan*, 352 N.W.2d at 504.

¶34 In *MacKinnon-Parker, Inc. v. Lucas Metropolitan Housing Authority* (1992), 84 Ohio App.3d 453, 616 N.E.2d 1204, appellant bidder argued that the Housing Authority's Notice of Contract Award constituted acceptance, and that a contract had been formed. The Notice stated: "This is to advise you that your proposal for the above referenced project has been accepted by this Authority and approved by HUD, Cleveland. We are preparing the necessary Construction Contract documents . . . in order that they may be executed by your firm." *MacKinnon*, 84 Ohio App.3d at 457, 616 N.E.2d at 1207.

¶35 In holding that no contract was formed until the formal execution of the written instrument, the Court of Appeals relied on the requirement of Ohio's public bidding statute that a contract must be executed within sixty days after the bids are opened, and noted that the bid documents required the successful bidder, upon receiving the Notice of Contract Award, to deliver a contract "in the prescribed form" and to furnish a contract performance bond within ten days after the contract is presented for signature. *MacKinnon*, 84 Ohio App.3d at 457, 616 N.E.2d at 1206. The Court further noted that the required bid bond was simply a guarantee that the successful bidder would later enter into a bona fide contract and provide a performance bond, or, upon the bidder's failure to do so, that the Housing Authority would be compensated for the damages caused by such failure. *MacKinnon*, 84 Ohio App.3d at 456, 616 N.E.2d at 1206.

¶36 In so holding, the Court of Appeals distinguished *Commissioners of Highland Cty. v. Rhoades* (1875), 26 Ohio St. 411, wherein the Ohio Supreme Court had held that a contract is formed upon acceptance and notice of acceptance of a bid, the only purpose of the later agreement being to evidence the contract entered into. This rule is not applicable, the Court stated, "where it is understood that the acceptance of the bid and execution of a formal contract are both conditions to the formation of a contract between the parties." *MacKinnon*, 84 Ohio App.3d at 455, 616 N.E.2d at 1205 (citing *Commissioners of Highland Cty. v. Rhoades* (1875), 26 Ohio St. 411 and *Hughes v. Clyde* (1884), 41 Ohio St. 339, 340). "This two-part acceptance of the contract may be imposed by the invitation to accept the bids or by virtue of the fact that the party seeking the bid is authorized by statute to contract only under certain circumstances, *i.e.,* by a formal written contract." *MacKinnon*, 84 Ohio App.3d at 455, 616 N.E.2d at 1206.

¶37 In the instant matter, a bid bond, or "bidder's security," was required to be submitted by Oftedal pursuant to § 18-1-201(2), MCA, which provides that the public authority:

> shall require, as a condition precedent to considering any such bids, as evidence of good faith on the part of the bidder, and *as indemnity for the benefit of such public authority against the failure or refusal of any bidder to enter into any written contract* that may be awarded upon and following acceptance of bid . . . that any bid shall contain a written covenant of indemnity conditioned as herein prescribed and that the bid shall be accompanied by bid security of the nature herein specified for the performance of such covenant. [Emphasis supplied.]

¶38 Section 18-1-202(2), MCA, requires that the bid bond be in the amount of 10 percent of the bid price, again to "protect and indemnify the public authority against the failure or refusal of the bidder *to enter into the contract* . . . ." (Emphasis supplied.)

¶39 Section 18-1-202(1)(a), MCA, provides in part that the advertisement for bids must distinctly specify that all contractors shall "expressly covenant in any bid that if the bidder is awarded the contract, the bidder will, within the time required as stated in the advertisement or solicitation, *enter into a formal contract* and give a good and sufficient *bond to secure the performance* of the terms and conditions of the contract." (Emphasis supplied.)

¶40 If, after the award, the successful bidder refuses to enter into and execute the contract, § 18-1-204, MCA, requires that "any bidder whose bid is accepted and who shall

thereafter refuse to enter into and execute the *proposed contract*, . . . as stated in the covenant in the bid and herein, shall absolutely forfeit such moneys or bank instruments to the public authority . . ." (Emphasis supplied.)

¶41 Included with the bid proposal documents, § 103.02 of the Specifications reserves the right of the Commission to reject all bid proposals accompanied with the return of all proposal guarantees (bid bonds). Section 103.04 of the Specifications further reserves the right of the Commission to cancel the award prior to execution of the contract: "The award of the Contract may be canceled at any time before the execution of the Contract by all parties without liability against the Department."

¶42 Section 103.05 of the Specifications provides that all bid bonds will eventually be returned, including the bid bond of the successful bidder, following receipt of a separate contract bond, securing the performance of the terms and conditions of the contract, and execution of the contract. *See also* § 18-1-205, MCA.

¶43 Section 103.07 of the Specifications provides the successful bidder must, within twenty days after receipt of the contract documents following award of the project, provide MDT with the signed contract, a satisfactory contract performance bond and satisfactory evidence of the required insurance policy. If the successful bidder fails to provide the above in a satisfactory manner within the twenty days after the award, § 103.08 of the Specifica-tions provides that the award may be canceled and the bid bond forfeited under the provisions of § 18-1-204, MCA.

¶44 It is clear that Oftedal submitted the bid bond solely as an indemnity for the benefit of MDT against Oftedal's refusal to enter into the written contract. Sections 18-1-201(2) and -202(2), MCA. The full amount of the bid bond was to be returned to Oftedal after the execution and approval of the contract by MDT, as there would no longer be a need to secure Oftedal's covenant to enter into a written contract. Section 103.05, Specifications. It is also clear that, immediately after the award and up to the time of the execution of the contract, MDT was not bound by the terms of the contract and retained discretion to withdraw the award of the contract at any time without liability. Sections 103.02 and 103.04, Specifications. This fact is commonly found to be critical in a court's review of the issue: see *State of Alaska v. Johnson, supra,* (no contract at award because state had not exhausted its discretion to reject the bid and rebid the contract), and *Johnson v. City of Jordan*, *supra,* (contract formed at award because city no longer retained discretion to reject the bid).

¶45 In the instant case, based upon the above-referenced statutes and Contract Specifications, it is clear that conditional requirements must be met and a formal contract executed in order to bind MDT. Under these circumstances, *1 Williston on Contracts* § 4:10 (4th ed. 1990), is informative:

> In the case of public contracts, certain additional formalities are often required by statute or by the request for bids under such statutes, such as the execution of a written contract, or the requirement that a satisfactory bond be furnished. In such cases, even after acceptance of the bid has occurred, *no contract is formed until the requisite formality has been complied with.* [Emphasis supplied.]

¶46 We conclude, therefore, as a matter of law, that no contract for the performance of this federal highway project was formed by award of the project to Oftedal on September 1, 1999. Consequently, the District Court erred in concluding that Oftedal did not give timely notice of the mistakes prior to the award, because no such notice was necessary at that time to obtain relief pursuant to § 28-2-1611, MCA. As no contract was formed prior to the execution of the written contract on September 22, 1999, there could be no requirement that MDT have knowledge of Oftedal's unilateral mistake prior to the award of the project on September 1, 1999.

### B. Reformation of Contract

¶47 Reformation of a contract is an equitable remedy which allows a court to revise a contract to reflect the true intentions of the parties. *In re Marriage of Pfennigs*, 1999 MT 250, ¶ 31, 296 Mont. 242, ¶ 31, 989 P.2d 327, ¶ 31. The grounds for reformation of a contract in Montana are fraud, mutual mistake or unilateral mistake of which the other party knew or suspected, which results in a contract that does not truly express the intention of the parties. Section 28-2-1611, MCA. A mistake is an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract. Section 28-2-409, MCA.

¶48 This Court has previously refused to allow reformation of contract where a party making a unilateral mistake entered into a contract while having actual knowledge of the mistake. *Goodman Realty, Inc., v. Monson* (1994), 267 Mont. 228, 883 P.2d 121. In *Goodman* we held that reformation "belongs to the aggrieved party who is laboring under a mistake known or suspected by the other party," as opposed to an aggrieved party who knew of the mistake prior to signing the contract while the other party had no knowledge. *Goodman*, 267 Mont. at 232-33, 883 P.2d at 124.

¶49 Neither situation exists in this case. Oftedal did not have knowledge of the mistake in the absence of knowledge by MDT, nor did MDT have knowledge of the mistake in the absence of knowledge by Oftedal. Rather, because both parties knew of Oftedal's unilateral mistake prior the execution and formation of the contract, our holding in *Goodman* is inapplicable to the facts in the present situation. In the instant case it is clear that the mistakes in Oftedal's bid were unilateral on the part of Oftedal and that specifics of these mistakes were made known to MDT immediately after Oftedal discovered the mistakes and prior to execution of the written instrument-and therefore, in this case, prior to the formation of the contract. It is also clear from the parties' Stipulation of Facts, as well as from comments made at the Commissioners' meetings, the minutes for which are part of the stipulated documents, that Oftedal did not intend to make the mistakes in its bid. The Stipulation provides:

> As a direct result of Oftedal's mistakes, the bid was different than Oftedal might otherwise have intended the bid to be. If Oftedal had not made such mistakes, the bid would have been in the sum of $8,607,265.98, which revised contract sum would reflect Oftedal's original bid modified and revised upward to reflect the inadvertent omissions in the sum of $789,000.00.

¶50 The State argues that Oftedal should be denied its requested relief on a number of additional grounds. First, the State argues that general principles of contract law provide that recision, not reformation, is the proper remedy for unilateral mistakes. Second, the State argues that the errors in Oftedal's bid were the result of Oftedal's negligent business practices which prevented Oftedal from discovering the errors between the opening of the bids and the award of the contract, and as such, equity does not provide relief for those who have not been vigilant. Third, the State argues that the Commission's decision regarding to whom it will award public works contracts is not subject to judicial review absent a showing of bad faith, fraud or corruption, none of which has been shown by Oftedal. Fourth, the State contends that allowing a low bidder to raise its bid amount while still remaining the low bidder opens the door for much "mischief and abuse" by bidders and is tantamount to destroying the integrity of the public bidding process. Fifth, the State argues that Oftedal contracted to waive his right to an upward revision of the bid without the express written consent of MDT. Finally, the State argues that Montana's taxpayers will be prejudiced in the amount of any upward revision as the State will be required to fund the total amount of the upward revision as the FHWA will not participate with federal funding above Oftedal's original bid amount.

¶51 We first address the State's objection to Oftedal's eligibility for contract reformation relief. While the State argues that reformation is inappropriate for unilateral mistake, its position is not consistent with Montana law. As stated above, one ground for reformation of contract in Montana is unilateral mistake of which the other party knew or suspected, as clearly provided by § 28-2-1611, MCA.

¶52 Contrary to the State's second argument, negligence of the party creating the mistake is not necessarily a bar to judicial reformation of a contract. As stated by the Supreme Court of Washington, "[i]f negligence were a defense to a reformation claim, then reformation would almost never be available as a remedy because mistake is most frequently a basis for reformation, and negligence generally results from mistake." *Washington Mut. Savings Bank v. Hedreen* (1994), 125 Wn.2d 521, 531, 886 P.2d 1121, 1126. "It is not essential, therefore, that one seeking the aid of a court of equity to reform a contract show that he is wholly free from fault. Mere negligence not rising to the dignity of a violation of a positive legal duty, as negligence that is a mere inadvertence, does not preclude relief." *Hedreen*, 125 Wn.2d at 530, 886 P.2d at 1126 (citing *Meyer v. Young* (1945), 23 Wn.2d 109, 113, 159 P.2d 908).

¶53 *Hedreen* is consistent with Montana statute. Section 28-2-409, MCA, defines mistake in the contract context as one not caused by "neglect of duty," yet "consisting in . . . an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract." This defines an error of "mere inadvertence." *Hedreen*, 125 Wn.2d at 530, 886 P.2d at 1126.

¶54 In the instant matter, the parties stipulated and recognized that Oftedal's mistakes were inadvertent, and the bid was not what Oftedal intended it to be. Although some negligence may be inherent in Oftedal's mistakes, viewed in light of the parties' agreed assessment of the nature of the errors, Oftedal's mistakes cannot be said to preclude equitable relief under the statutes.

¶55 Contrary to the State's third argument, judicial modification of the contract in this matter will not interfere with the discretion of the Commission to award public contracts to qualified bidders, based on its own determination. Oftedal did not appeal the decision of the Commission denying Oftedal's request to either rescind the award or to revise the contract sum upward. Oftedal signed the written contract, and then pursued the equitable remedy of reformation for its unintended mistakes in its bid that are now included as part of the contract. Nor does such relief jeopardize the public bidding process, as contended

by the State in its fourth argument. Reformation of a written contract will be allowed only where a mistaken party so deserves under § 28-2-1611, MCA, and a bidder attempting to circumvent the public bidding laws with intentionally low bids faces an uphill battle in attempting to demonstrate that it committed the kind of mistake constituting "an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract" that the State knew or suspected, and which resulted in a written contract that does not express the intention of the parties, as Oftedal has demonstrated here. Section 28-2-409, MCA.

¶56 The State next argues that Oftedal waived any right to request or receive any upward revision of its bid. The bid proposal reads, "In submitting this bid, bidder agrees that it waives any right or ability to claim, request or receive any upward revision of this bid without the express written consent of the Department and in accordance with the standard specifications." Oftedal requested such relief, and the Commission, exercising its discretion, refused to give its consent to any upward revision. However, as stated, Oftedal did not appeal from this discretionary decision of the Commission, making such language irrelevant to Oftedal's requested modification pursuant to § 28-2-1611, MCA.

¶57 Additionally, the State confuses reformation of bid with reformation of contract. Under the terms of the bid documents, the Commission retains discretion to either grant or deny a request for an upward revision of the bidder's *bid*. Once the contract is formed and both parties are bound, a request for a modification is a request to modify the *contract* and must be requested pursuant to § 28-2-1611, MCA, which is applicable only where parties have entered into a written contract and some form of mistake is subsequently discovered, or, as the situation exists here in the context of a public bid letting, where Oftedal discovered the mistakes and MDT knew of the mistakes prior to contract formation.

¶58 Finally, the State argues that Montana's taxpayers will be prejudiced if an upward revision is allowed, as the State will be responsible to fund any amount of the contract over and above Oftedal's original bid amount. Oftedal argues that the State will not lose any money in the long run because the federal funds not able to be used on this project can be shifted to another federally funded project. This Court is without sufficient information to determine whether this is correct, but what is clear at this juncture is that the State will be responsible to pay any amount of the contract above Oftedal's original bid, if FHWA does not reconsider its decision not to participate. While this is unfortunate, it is also clear that absent an upward revision of the contract sum, the State will receive the benefit of $789,000 of work and material provided by Oftedal, and expended for the improvement of

the highways for the benefit of the public, without any compensation returned to Oftedal. This Court is required pursuant to § 28-2-1612, MCA, for the purpose of revising a contract, to presume that all parties intended to make an equitable and conscientious agreement. This Court cannot presume that Oftedal intended to incur the hardship of supplying $789,000 of work and material to the State without compensation, and further, we cannot presume that the State harbored such intention, either.

¶59 The decision of the District Court is reversed and remanded. Upon remand, the District Court is ordered to enter judgment in favor of Appellant E. H. Oftedal and Sons, Inc., revising the contract sum upward in the stipulated amount of $789,000, to a modified contract price of $8,607,265.98, and ordering the contract to be performed as so revised.

/S/ JIM RICE

We concur:

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

Justice Patricia O. Cotter, dissenting,

¶60 I dissent. Not only does the majority's conclusion completely upset the public contract bidding process, it jettisons basic contract principles of offer and acceptance, and ignores the tenets of equitable relief. The ultimate effect of this Opinion is to impose a stricter obligation on MDT to find mistakes in a submitted bid than is imposed on the bidder himself; thus allowing a bidder to amend an offer, after it is accepted, even though he created the offer in haste, failed to use care in checking the details prior to submitting the offer, failed to effectively rule out suspicions that the figures were wrong, and then waited until the contract was accepted before fully reviewing the offer for errors.

¶61 Although the majority applies the standard for reviewing an order granting summary judgment, it ultimately grants relief by reforming Oftedal's contract. Clearly this is a case in equity. This Court has repeatedly held that equitable issues are a matter of discretion resting with the district court and will be sustained unless an abuse of discretion is shown.

*Ruegsegger v. Welborn* (1989), 237 Mont 317, 321, 773 P.2d 305, 308 (citations omitted). The District Court did not abuse its discretion in refusing to reform Oftedal's contract pursuant to § 28-2-1611, MCA. Nor did the District Court err when it concluded a contract was formed between Oftedal and MDT upon acceptance of Oftedal's bid.

¶62 In *Baker*, the Court stated that "[i]t is a well founded principle of contract law that a contract does not exist prior to the acceptance of a bid by an agency." *Baker v. State*, 218 Mont. 235, 238, 707 P.2d 20, 22. The majority rejects the Commission's reliance on *Baker* for the proposition that a binding contract is formed upon the acceptance of a low bidder's bid.

¶63 However, this Court applied similar language in *Modern Machinery v. Flathead County* (1982), 202 Mont. 140, 656 P.2d 206, when it held that a written bid, issued in response to a call for bids to purchase a piece of equipment, amounted to an offer that ripened into a contract upon acceptance by the commissioners. *Modern Machinery*, 202 Mont. at 146, 656 P.2d at 210. We stated: "a written bid has consistently been construed as nothing more than an offer to perform labor or supply materials, and the offer does not ripen into a contract until accepted by the offeree." *Modern Machinery*, 202 Mont. at 145, 656 P.2d at 209 (citing *Carriger v. Ballenger* (1981), 192 Mont. 479, 483-84, 628 P.2d 1106, 1108-1109) (emphasis added). In *Modern Machinery*, we concluded that a binding contract was formed between the county and the manufacturer when the commissioners accepted the offered bid by seconding and recording a motion to accept the bid during a commissioners' meeting. *Modern Machinery*, 202 Mont. at 146, 656 P.2d at 210.

¶64 The conclusion that a contract is formed upon acceptance of an offered bid follows time-honored Montana precedent. In *State v. Toole* (1901), 26 Mont. 22, 29, 66 P. 496, 499, this Court found that once the statutory prerequisites essential to a valid acceptance are complied with, and a contract is awarded, "there springs into existence vested rights, which the board cannot destroy or impair," and conditions may not be inserted into the formal written contract if they are "not consonant with the contract already made by virtue of the acceptance of the bid" (the furnishing board's attempt to rescind a contract, which was formed upon the board's acceptance of plaintiff's offer, was void) (citation omitted). In *Stuewe v. Hindson* (1912), 44 Mont. 429, 436-37, 120 P. 485, 487, while holding there was no mandamus remedy available to an unsuccessful bidder, we stated:

> In general terms, it is said that a contract is consummated by an offer from one party and its acceptance by another. The advertisement for bids is not an offer which by

acceptance constitutes a contract. It is merely an invitation to every bidder to make an offer, <u>which the board may accept, and a contract result</u>; but a party whose offer is not accepted cannot complain or invoke the aid of courts to compel the board to accept his offer (citation omitted). [Emphasis added.]

¶65 The Commission's reliance on the language of *Baker, supra*, is not misplaced. There is a century of case law for the proposition that an offer, once accepted, ripens into a binding agreement. I disagree with the majority's conclusion that the contract was not created until execution of the "formal" contract. Accordingly, I disagree that the contract should be revised, especially given that MDT had no knowledge of any errors at the time it accepted Oftedal's bid.

¶66 The majority attempts to infer limits on liability based on the mere formality of executing a written contract. This reasoning is not only circular, it also underscores the fact there is no explicit specification prohibiting liability. The procedure of signing the "formal" contract was not a condition precedent to the contract's enforceability. Section 18-1-202(1), MCA, provides: "The advertisement, request, or solicitation for bids or offers must distinctly specify that all bidders, offerors, tenderers, or contractors shall: (a) whenever bids are solicited . . . <u>expressly covenant</u> in any bid that if the bidder is awarded the contract, the bidder <u>will</u>, within the time required as stated in the advertisement or solicitation, enter into a formal contract and give a good and sufficient bond . . . " (emphasis added). In addition, bidders must also provide bid security, pursuant to § 18-1-201, MCA.

¶67 From these statutes and Specifications in the Bid Package, the majority crafts a condition precedent to the creation of a contract between Oftedal and MDT. The majority relies on an excerpt from *Williston on Contracts* to support the proposition that these statutory requirements are intended as conditions precedent to the execution of the "formal" contract. However, the majority fails to refer to § 18-1-201(2), MCA, which describes the requirements for bidder's security, and states in part that:

> [I]n all cases where a public authority or obligee is authorized by law to solicit bids . . . such public authority shall require, as a <u>condition precedent to considering any such bids</u>, as evidence of good faith on the part of the bidder, and as indemnity for the benefit of such public authority against the failure or refusal of any bidder to enter into any written contract that may be awarded upon and following acceptance of bid . . . that any bid shall contain a written covenant of indemnity conditioned as

herein prescribed and that the bid shall be accompanied by bid security of the nature herein specified for the performance of such covenant. [Emphasis added.]

These safeguards are in place as conditions precedent to the public body considering the offer proposed by the bidder, not as conditions precedent to the formation of a binding agreement between the public authority and the successful bidder. Oftedal met these requirements when it promised in its bid proposal that it would sign the contract, and when it provided the required bid security. Based on these promises, MDT considered and ultimately accepted Oftedal's bid.

¶68 Further, as stipulated by the parties, it is "each bidder's responsibility to submit its bid in accordance with the bid documents and its review of the scope of work, site of work, and the contract documents." When it signed the proposed bid, Oftedal agreed to subsection (F) of the Proposal: "In submitting this bid, bidder agrees that it waives any right or ability to claim, request or receive any upward revision of this bid without the express written consent of the Department and in accordance with the Standard Specifications." Oftedal also affirmed, pursuant to the Proposal, that it examined the site, proposal, standard specifications, supplemental specifications, and special provisions, and that it had sufficient time to prepare its bid. Oftedal assented "to all provisions and requirements of the Contact, as defined in the Standard Specifications." Oftedal agreed it "would not submit this bid if it did not agree to each and every provision of the Contract." Oftedal, a seasoned bidder, clearly was aware of all the components and requirements of the agreement between the MDT and Oftedal; thus there was a meeting of the minds between the two parties. *See Chadwick v. Giberson* (1980), 190 Mont. 88, 92, 618 P.2d 1213, 1215 ("there must be mutual assent or a meeting of the minds on all essential elements or terms to form a binding contract").

¶69 I would hold that a contract was formed upon the acceptance of Oftedal's submitted bid, or in the least I would hold that Oftedal should not be rewarded for its negligence in submitting the bid and failing to thoroughly review the figures when it suspected there was error.

¶70 Even if I were to agree with the majority's conclusion that the contract was formed upon execution of the written agreement, the statute the Court relies on, § 28-2-1611, MCA, is permissive, and does not require revision by a court. All the errors at issue were attributable to only Oftedal, and specifically its employee, Lundby, in his preparation of the bid. In an attempt to explain the errors, Oftedal asserted that Lundby's workload was

such that time did not allow complete review, and that due to company organization, Lundby was the only person who could review the bid. These are clearly business practice choices made by Oftedal, for which the State should not suffer given Oftedal's substantial errors. Moreover, Lundby admitted in a letter to the Department that the mistakes were due to "poor time management" and were a "direct result of [him] not allowing [himself] adequate time to estimate the project." Clearly these mistakes were not due to ignorance or forgetfulness of facts, and thus did not meet the definition of mistake of fact as required under § 28-2-409, MCA. I agree with the District Court's conclusion that: "Oftedal chose to conduct business in a seemingly hectic atmosphere without the benefit of having a second person check the bid before it was submitted or other similar 'safety net.' "

¶71 Oftedal should not reap the benefits of its errors, at the expense of the State of Montana. Section 28-2-1611, MCA, states that a court may revise a contract, "so far as it can be done without prejudice to rights acquired by third persons in good faith and for value." A court is not mandated to revise a contract under § 28-2-1611, MCA. A district court's decision to provide equitable relief is a matter of discretion which we will sustain absent a showing of an abuse of discretion. *Ruegsegger,* 237 Mont. at 321, 773 P.2d at 308. Abuse of discretion exists when "the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Lee v. USAA Cas. Ins. Co*., 2001 MT 59, ¶ 27, 304 Mont. 356, ¶ 27, 22 P.3d 631, ¶ 27 (citation omitted). Based on the magnitude and nature of Oftedal's errors, its failure to thoroughly review its bid even when mistakes were suspected, and the absence of any fault attributable to the State, the District Court clearly did not act "arbitrarily without conscientious judgment or exceeded the bounds of reason resulting in substantial injustice."

¶72 By allowing upward revision of the contract price, the majority also guts the bond forfeiture statute, § 18-1-204, MCA. Section 18-1-204, MCA, states in pertinent part: "[A]ny bidder whose bid is accepted and who shall thereafter refuse to enter into and execute the proposed contract . . . as stated in the covenant in the bid and herein, shall absolutely forfeit such moneys . . . to the public authority concerned and become immediately liable on the bid bond . . . ." In light of the Court's holding, successful bidders who want to revise their bid are better off to sign a contract, and later seek relief through the district court, than accept loss of bond pursuant to § 18-1-204, MCA. The majority asserts that this decision does not jeopardize the public bidding process (See ¶ 55 herein). I disagree. This decision has the effect of inviting a party to prolong the uncertainty in the bidding process, by by-passing an appeal of the decision of the Commission in favor of the pursuit

of equitable relief from the court.

¶73 The clean hands doctrine provides that "[p]arties must not expect relief in equity, unless they come into court with clean hands." *See Kauffman-Harmon v. Kauffman*, 2001 MT 238, ¶ 19, 307 Mont. 45, ¶ 19, 36 P.3d 408, ¶ 19 (citation omitted). Moreover, "[n]o one can take advantage of his own wrong." Section 1-3-208, MCA. Accordingly, "this Court will not aid a party whose claim had its inception in the party's wrongdoing, whether the victim of the wrongdoing is the other party or a third party." *Kauffman-Harmon,* ¶ 19 (citation omitted). "Equity, of course, aids only those who have been vigilant, and will refuse relief to one who has been dilatory or wanting in diligence in prosecuting his cause of action." *Housing Authority of the City of Butte v. Murtha* (1943), 115 Mont. 405, 410, 144 P.2d 183, 185 (citation omitted). Further, courts must inquire carefully into purported mistakes in order to prevent collusion and fraud by the parties making the proposals and are:

> justified in refusing relief when there is good cause for believing that some other reason than mere mistake is behind the bidder's unwillingness to perform the contract or his desire to withdraw from the bid. Relief may be denied on the ground that it did not clearly appear that the mistake was one of material fact as distinguished from an unwise, hasty, or careless statement of prices intended to be bid. If the mistake might have been avoided by the exercise of ordinary care and diligence on the part of the bidder, he or she will be denied equitable relief.

64 Am. Jur. 2d Public Works and Contracts § 83 (2001) (emphasis added).

¶74 Had Oftedal exercised ordinary care and diligence, the mistakes would have been caught in the twelve days that passed between the bid opening and the award of the contract. Clearly Oftedal does not have clean hands in this matter--in fact, it was its own negligence that created the situation from which we have now rescued Oftedal. Even if I were to agree that the contract between Oftedal and MDT was not created until execution of the formal contract, revision of such a contract is not mandatory under § 28-2-1611, MCA. The State should not have to bear the burden of Oftedal's negligence. Oftedal's errors were not unconscious ignorance or the result of forgetfulness. Because Oftedal's hands were not clean, it is not entitled to equitable relief.

¶75 The primary function of Montana's bidding statutes is to benefit the citizens. *Baker*, 218 Mont. at 239, 707 P.2d at 23. "Competitive bidding statutes are primarily intended for

the benefit of the public rather than for the benefit or enrichment of bidders, and consideration of advantages or disadvantages to bidders must be secondary to the general welfare of the public." 72 C.J.S. Public Contracts § 8 (1975). With this Opinion, we have placed the bidder's pecuniary interests ahead of the interests of the public.

¶76 I would conclude the District Court did not abuse its discretion either in refusing to reform Oftedal's contract or in concluding that a contract was formed between Oftedal and MDT upon acceptance of Oftedal's bid. I would therefore affirm the decision of the District Court.

/S/ PATRICIA COTTER