FILED

08/06/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0564

DA 23-0564

## IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 167

ANTHONY CORDERO, on behalf of
himself and all others similarly situated,

Plaintiffs and Appellants,

v.

MONTANA STATE UNIVERSITY and
WADED CRUZADO,

Defendants and Appellees.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV-2020-1975
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Adrian A. Miller, Michelle M. Sullivan, Sullivan Miller Law PLLC,
Billings, Montana

Michael Tompkins, Anthony Alesandro, Leeds Brown Law, P.C., Carle
Place, New York

For Appellees:

Dale R. Cockrell, Eric M. Brooks, Braden S. Murphy, Moore, Cockrell,
Goicoechea & Johnson, Kalispell, Montana

Submitted on Briefs:  June 5, 2024

Decided:  August 6, 2024

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Anthony Cordero (Cordero) was a student at Montana State University (MSU) during the Spring semester of 2020. Cordero sued MSU, requesting prorated reimbursement of his tuition and fees, when it transitioned to online learning due to the COVID-19 pandemic. The First Judicial District Court of Lewis and Clark County dismissed four of Cordero's six claims against MSU in its Dismissal Motion Order on October 26, 2021, and granted summary judgment in favor of MSU on Cordero's remaining claims in its Order on Pending Motions on August 22, 2023. Cordero appeals both Orders. We affirm.

¶2 We restate the issues on appeal as follows:

1. *Whether MSU had an express contractual duty to provide in-person and on-campus education and services to Cordero during the spring semester of 2020.*

2. *Whether the District Court erred when it dismissed Cordero's implied contract claim under M. R. Civ. P. 12(b)(6).*

3. *Whether the District Court erred when it dismissed Cordero's unjust enrichment claim under M. R. Civ. P. 12(b)(6).*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On March 23, 2020, MSU transitioned its campus services and educational instruction online due to the COVID-19 pandemic. However, MSU kept the majority of its physical campus open and operational through the remainder of the Spring 2020 semester to offer services to students who required them. The campus fitness center and fitness domes were temporarily closed, but MSU continued to maintain them. Intramural activities were stopped for the remainder of the semester, but the practice fields remained

2

open to students. Computer labs remained open. The library was closed to in-person patrons, but library services remained available online, and students could still arrange to check out books. The health centers on campus remained open, as did the parking lots. As a result of these transitions, Cordero filed an amended complaint on February 26, 2021, against MSU and the university's President, Waded Cruzado. Cordero asserted six claims: (1) breach of express contract, (2) breach of implied contract, (3) a due process violation, (4) unjust enrichment, (5) violation of the takings clause, and (6) inverse condemnation.

¶4 Cordero asserted MSU entered a contract with him through the admission process whereby MSU promised to provide an on-campus education with in-person instruction, campus facilities, services, and resources in exchange for his tuition and fee payments. Cordero claims he did not register or enroll in MSU's online program, but rather he enrolled and paid the full price of tuition to attend MSU's physical campus. Cordero alleges he paid $19,901 for his Spring 2020 semester, including a student building fee of $22.50, a non-resident building fee of $15.20, a bus fee of $5.25, an equipment fee of $23.22, an intramural fee of $23.70, an information technology fee of $46.10, an outdoor recreation fee of $8.31, a recreational facility fee of $13.38, a student facilities enhancement fee of $27.90, a student leadership fee of $6.37, a student organization fee of $9.89, a student press fee of $2.70, and several other fees.

¶5 According to Cordero, his contract with MSU arose from language within MSU's course catalogue, student bill of rights, student handbook, acceptance letter, and website. Cordero claims these documents, combined with representations made during the application, acceptance, enrollment, and registration processes, defined the terms of their

agreement to provide on-campus education in exchange for tuition and mandatory fees. For example, Cordero points to language in the course catalogue that provides students will be able to make friends in the residence hall, connect with the community, use the computers throughout campus, participate in music ensembles, and eat on campus.

¶6 Cordero asserted that MSU breached its contract when it closed its campus and stopped providing in-person instruction and on-campus facilities while retaining his tuition. Cordero claimed MSU replaced its in-person program with MSU online without allowing him to pay the lower price MSU online students pay. Cordero argued he was entitled to an award of money damages including prorated reimbursement of the tuition, fees, and other expenses for services and facilities that MSU failed to fully deliver.

¶7 MSU filed a M. R. Civ. P. 12(b)(6) motion to dismiss Cordero's complaint. The District Court dismissed Cordero's claims for breach of implied contract, due process, takings, and unjust enrichment, but found Cordero's claims for breach of express contract and inverse condemnation withstood Rule 12(b)(6) scrutiny.[1] MSU then filed a motion for summary judgement, arguing the alleged express contract between Cordero and MSU did not exist, and MSU's actions were pursuant to the State's power to protect the health and safety of students and employees. Cordero also filed a motion to certify the case as a class action for all MSU students impacted by the on-campus closure. The District Court granted MSU's summary judgment motion and denied Cordero's class certification motion. The

[1] All claims that initially named MSU President, Waded Cruzado, as a party were dismissed at this stage.

4

court determined Cordero's breach of express contract claim failed because he did not identify a specific, bargained-for promise made by MSU. As for Cordero's inverse condemnation claim, the court determined Cordero had no compensable property interest in the tuition and fees he voluntarily paid for his Spring 2020 semester. Cordero appeals only the District Court's Order dismissing his implied contract and unjust enrichment claims under M. R. Civ. P. 12(b)(6) and the court's Order granting summary judgment in favor of MSU for the express contract claim.

## STANDARD OF REVIEW

¶8 This Court reviews a district court's ruling on a M. R. Civ. P. 12(b)(6) motion to dismiss de novo. *Marshall v. Safeco Ins. Co.*, 2018 MT 45, ¶ 6, 390 Mont. 358, 413 P.3d 828. When reviewing an order dismissing a complaint under M. R. Civ. P. 12(b)(6), we construe the complaint in the light most favorable to the plaintiff. *Marshall*, ¶ 6. The district court must not dismiss a complaint for failure to state a claim, "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Marshall*, ¶ 6. The district court's ruling that a complaint failed to state a claim is a conclusion of law that we review for correctness. *Marshall*, ¶ 6.

¶9 We review district court summary judgment rulings de novo for conformance to the applicable standards specified in M. R. Civ. P. 56. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.*, 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is only appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). A genuine issue of material fact is

5

a fact materially inconsistent with proof of an essential element of a claim or defense at issue. *Lawrence v. Pasha*, 2023 MT 150, ¶ 8, 413 Mont. 149, 533 P.3d 1029.

¶10 To meet the Rule 56 burden of demonstrating that a genuine issue of material fact exists, the non-moving party must in proper form, and by more than mere denial, speculation, or pleading allegation, set out specific facts showing the existence of a genuine issue of material fact. M. R. Civ. P. 56(e)(2). The opposing party's "proffered evidence must be material and of a substantial nature, not fanciful, frivolous, gauzy or merely suspicious." *Estate of Willson v. Addison*, 2011 MT 179, ¶ 14, 361 Mont. 269, 258 P.3d 410. Whether a genuine issue of material fact exists or whether a party is entitled to judgment as a matter of law are conclusions of law that we review de novo for correctness. *Lawrence*, ¶ 9.

## DISCUSSION

¶11 *1. Whether MSU had an express contractual duty to provide in-person and on-campus education and services to Cordero during the spring semester of 2020.*

### A. Tuition[2]

¶12 The District Court determined there was no express contract between Cordero and MSU that required MSU to provide, at all times, in-person educational services. The court noted there was nothing in the record indicating an actual bargained-for agreement between Cordero and MSU. Cordero asserts he does not challenge MSU's decision to close campus

---

[2] Because Cordero seeks a prorated refund for both his tuition and fees paid to MSU for the Spring 2020 semester, we consider each refund in turn.

6

during the COVID-19 pandemic, rather he challenges MSU's failure to provide him a refund for the fees and tuition he paid.

¶13 Cordero argues his MSU application serves as the express contract between him and MSU. Cordero alleges his application incorporates terms from MSU's course catalog, student handbook, and student bill of rights. Cordero claims he does not have to identify an express statement where MSU promises to provide in-person education because it can be implied from MSU's course catalog, student handbook, and numerous other documents. Finally, Cordero asserts the District Court erred by granting summary judgment when the contract was, at a minimum, ambiguous with respect to MSU's obligations.

¶14 MSU argues that the cases Cordero cites to do not support his claims, noting the cases are inapplicable because they do not find there was an express contract for in-person education, services, or tuition or fee refunds. Rather, MSU asserts that under Montana law, an express contract must contain the terms of the agreement in words. Accordingly, MSU asserts Cordero can point to no document where MSU promised to provide in-person education or to refund tuition or fees.

¶15 A contract may be implied or express. An express contract's terms are stated in words. Section 28-2-103, MCA. An implied contract's existence and terms are manifested by the conduct of the parties. Section 28-2-103, MCA. When interpreting an express contract, extrinsic evidence can only be considered "when a mistake or imperfection of the writing is put in issue by the pleadings" or "when the validity of the agreement is the fact in dispute." Section 28-2-905, MCA. Other evidence may also be considered to explain an extrinsic ambiguity or to establish illegality or fraud. Section 28-2-905, MCA. A

7

contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting. Section 28-3-301, MCA. When a contract is in writing, the intention of the parties is to be ascertained from the writing alone if possible. Section 28-3-303, MCA. However broad the terms of a contract may be, it extends only to those things concerning which it appears the parties intended to contract. Section 28-3-305, MCA.

¶16 Because this is a matter of first impression in Montana, we note other jurisdictions have considered nearly identical agreements between students and universities. Across the country, the precedent varies with some jurisdictions finding there to be enough evidence to maintain a claim for a contract,[3] and others finding insufficient evidence to maintain a claim for a contract between student and university.[4] Because both parties rely on out-of-state cases to support their arguments, we have given due consideration to both lines of

---

[3] *See, e.g.*, *Salerno v. Fl. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020) (noting that Florida law recognizes the contract between university and student is typically implied in the university's publications and "is more nebulous . . . [than] a typical contract situation where there is an express document with delineated terms that a plaintiff can reference."); *Zahn v. Ohio Univ.*, No. 2020-00371, 2020 Ohio Misc. LEXIS 230, 2020 WL 6163919 (Oh. Ct. Cl. Oct. 19, 2020) (denying a motion to dismiss when plaintiff adequately pled "an implied contract exists for an in-person education as opposed to an online education" under Ohio law).

[4] *See, e.g.*, *Smith v. Univ. of Pa.*, 534 F. Supp. 3d 463, 473 (E. D. Pa. Apr. 20, 2021) (granting motion to dismiss because plaintiff failed to show how the university violated a specific, written promise to provide in-person education); *Zagoria v. New York Univ.*, 20 Civ. 3610 (S.D.N.Y. Mar. 17, 2021) (granting NYU's motion to dismiss because plaintiff could not point to any express language promising in-person classes); *Shaffer v. George Washington Univ.*, 27 F.4th 754, 760 (D.C. Cir. Mar. 8, 2022) (affirming district court's finding that plaintiff cannot identify definite language amounting to an express promise for in-person instruction).

authority but must keep in mind these cases were decided under other states' laws and are not factually identical to the present litigation.

¶17     Here, Cordero's application stated:

> If my application for admission is approved, I agree to abide by the present and future rules and regulations, both academic and nonacademic, and the scholastic standards of Montana State University, its colleges, schools, departments and institutes, including, but not limited to, those rules, regulations and standards stated in the undergraduate/graduate catalog. I further acknowledge that if I fail to adhere to these regulations or meet these requirements, my registration may be canceled.

> If I enroll at Montana State University, I agree to pay all tuition, fees, fines and debts to the university that I may incur. I understand that MSU will take action against me to collect any unpaid debts, including withholding of registration, transcripts and assignment of the debt for collection, and I will be responsible to pay any costs incurred to collect the debt.

> If I fail to pay any tuition or fees when due, I understand the university will treat any unpaid amount as an educational loan extended to finance my education.

We conclude the language in Cordero's application created an express agreement where Cordero agreed to pay tuition, fees, and fines to MSU in exchange for admission to the university and enrollment in classes and programs of his choosing. The terms of the application incorporate by reference the rules and regulations stated in, but not limited to, the undergraduate catalog. Other documents related to the referenced rules, regulations, and standards of MSU include the student handbook and the student bill of rights. After reviewing the terms of the application and documents incorporated by reference, we do not find an express promise that MSU will provide a complete in-person, on-campus educational experience.

9

¶18    The Montana University System's (MUS) Board of Regents of Higher Education is "constitutionally vested with full responsibility to supervise, coordinate, manage, and control the MUS and its properties." *Bd. of Regents of Higher Educ. of Mont. v. State*, 2022 MT 128, ¶ 25, 409 Mont. 96, 512 P.3d 748.  Additionally, universities retain the ability to respond to emergencies that would require them to close campus, including for natural disasters, inclement weather, and terrorist attacks.[5]

¶19    MSU retained the right to suspend its normal operations in the event of an emergency.  MSU's undergraduate catalog states:

> This general catalog is published by Montana State University as a guide for students, faculty and others interested in the institution. . . . Montana State University reserves the right to change regulations and to add or withdraw courses at any time during the period this publication is in effect.  The institution, with the concurrence of the Board of Regents of Higher Education, also reserves the right to add or withdraw degree programs and to change fees at any time.

This provision warns students that MSU reserves the right to change regulations, courses, and fees at any time.  Presumably, this encompasses the right to adapt its regulations and policies to protect its students, faculty, and staff in the event of an emergency, including a global pandemic.  Nowhere within the catalog does MSU expressly promise a refund or credit in the event it had to change its regulations to temporarily move online to protect

---

[5] *See, e.g.*, *Roe v. Loyola Univ. New Orleans*, No. 07-1828, 2007 U.S. Dist. LEXIS 86944, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) (dismissing a breach of contract claim where law school transferred students to a nearby law school for one semester while campus was closed following Hurricane Katrina); *Paynter v. New York Univ.*, 319 N.Y.S.2d 893, (App. Div. 1971) (dismissing a breach of contract claim where university suspended classes following anti-war student protests and shooting at Kent State University).

students, faculty, and staff. Further, in his application, Cordero agreed "to abide by the present and future rules and regulations, both academic and nonacademic" set by MSU. Thus, based on the express language in the contract and incorporated documents, it appears the parties bargained for, at most, a presumption of in-person education but preserved the university's right to suspend campus-based instruction if it had a good-faith reason to do so. We cannot fathom upholding a prorated refund of tuition and fees for MSU being forced to close due to inclement weather that prohibits classes, which frequently occurs due to Montana winters. Here, Cordero was never deprived of classes, which were still conducted, albeit online.

¶20 Nevertheless, Cordero asserts the documents incorporated by reference in his application expressly require MSU to provide in-person educational services and facilities. For example, he points to language in the undergraduate catalog that states students can, among other things:

- Make new friends in the residence halls, explore Bozeman's backyard with the Outdoor Recreation Program, link up with likeminded people through one of the 300 plus student clubs and organizations, cheer the Cats to victory, or get résumé help at the Career, Internship & Student Employment Services Office.

- Contribute and invest your time, energy and talents by volunteering in one of our local and global community service opportunities. Our office hosts a variety of programs to help you connect to the area community.

- [H]ave access to over 600 computers in collaborative workspaces and labs in residence halls, academic halls, and the Renne Library. Lab computers offer specialized and industry-standard software packages for technology-specific assignments.

11

- [P]articipate in a variety of ensembles and classroom activities in the School of Music.

- Classroom opportunities in theatre arts are under the direction of an academically and professionally qualified faculty.

- [T]he flexibility and freedom to eat what, where, and when they want with the convenience of two locations across campus.

The language Cordero points to does not promise to provide in-person educational services. Rather, it informs students they have access to opportunities on campus. Such language found throughout the contract documents is not sufficient to create an express, written promise. Language that merely expresses an expectancy of something does not meet the standards of Montana's contract law. *See*, Restatement (Second) of Contracts § 26 c-mt. e, f (Am. L. Inst. 1981) ("Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance," and "[a] promise must be distinguished from a statement of opinion or a mere prediction of future events."); *Cf. Brooke v. State*, 2020 MT 187, ¶ 13, 400 Mont. 435, 468 P.3d 351 ("A contract becomes illusory when it consists of 'words in promissory form that promise nothing.'") (citing Corbin on Contracts § 5.28 (rev. 2019)).

¶21 Cordero alleges his interpretation is also supported by MSU's marketing materials, advertisements, and other related documents "that are replete with similar statements touting its campus, facilities, extracurricular activities, and classrooms." Again, Cordero misconstrues the effect of these materials. Under Montana law, advertisements generally do not constitute offers. *E. H. Oftedal & Sons v. State*, 2002 MT 1, ¶ 24, 308 Mont. 50, 40 P.3d 349. Advertisements and promotional materials only become part of a contract if

12

there is some language of commitment or an invitation to act without further communication with the offeror. Restatement (Second) of Contracts § 26 c-mt. b (Am. L. Inst. 1981). MSU's marketing materials and related documents do not contain any such provision and do not amount to any sort of express agreement. Although materials touting the campus experience may create the expectancy of an on-campus education, they do not definitively promise such.

¶22 Other jurisdictions have also held that informational and marketing materials, such as a university's website and brochures, are not part of a student's contract, nor are they statements of school policy or procedure. *See, e.g.*, *Smith*, 534 F. Supp. 3d 463, 473 (discussing how the university's website and brochures are not part of a student's contract); *Zagoria*, 20 Civ. 3610 (noting NYU's marketing and recruitment materials do not rise to the level of a specific promise to provide in-person, on-campus services); *Shaffer*, 27 F.4th 754, 760 (dismissing plaintiffs' tuition reimbursement claim because broad descriptions of the campus, common student experiences, and customary practices did not create an enforceable obligation on the university's part).

¶23 Cordero still completed his studies and classes for the Spring 2020 semester, albeit via online instruction. He received full credit for his classes. Although he did not get the experience he expected to get during the final half of the Spring 2020 semester, Cordero still progressed in his academic program and was able to graduate.

¶24 Because Cordero has not specifically alleged that MSU violated an express, written promise to provide in-person educational services and an on-campus experience in exchange for tuition, he has not stated a claim for breach of express contract. Although the

13

District Court determined there was no express contract, we affirm its holding on different grounds. "[W]e will affirm a district court's decision when it reaches the correct result for the wrong reasons." *State v. Kline*, 2016 MT 177, ¶ 34, 384 Mont. 157, 376 P.3d 132 (citation omitted). We hold that there was an express contract between Cordero and MSU. Although the District Court concluded an express contract did not exist between Cordero and MSU, its conclusion to award summary judgment in favor of MSU was the correct result because there is no genuine issue of material fact regarding whether MSU breached its contractual duties with respect to tuition.

### B. Fees

¶25     Cordero also seeks reimbursement for the fees he paid during the Spring 2020 Semester. Cordero asserts the promises MSU made regarding its student fees were even more explicit than its promises to provide in-person learning. Cordero claims his ability to access certain campus facilities and activities was a direct exchange for payment of the fees. The fees Cordero refers to include the Student Facilities Enhancement Project fee, which includes an "Operations & Maintenance Fee for the Health & PE Complex"; the Associated Students of Montana State University (ASMSU) fee, which "entitles the student to participate in ASMSU student government and use of the gym, swimming, weight room facilities, day care facilities, legal aid, tutoring, and other sponsored activities"; a mandatory computer fee "used to provide and enhance student computer labs and access"; the student equipment fee, which is a mandatory fee "used to provide and enhance classroom and student lab equipment"; and the ASMSU intramural fee for "the operational cost of the intramural facilities and programs."

14

¶26 MSU argues the fees were charged per credit hour and to operate its facilities. MSU points out the Board of Regents makes clear there is no direct promise for access to on-campus activities, facilities, and equipment because the Board defines "mandatory fees" as fees "assessed to all students registering at the campuses, regardless of the academic program or course of study chosen by the student." Thus, mandatory fees are charged to everybody as a condition of enrollment, and they do not promise anything in return, according to MSU.

¶27 MSU also makes it clear that even though the fitness center and fitness domes were temporarily unavailable to students, they were still maintained and supported. Additionally, intramural activities were halted for the remainder of the Spring 2020 semester, but the practice fields remained accessible to students. The computer labs also remained available for students to use. The campus parking lots, which required a paid parking pass, remained open for students to use. The library building was closed, but it was still in operation and allowed students to utilize its services online. MSU's health and counseling centers remained open by appointment.

¶28 We conclude the fee descriptions in the undergraduate catalog amount to specific, written promises to provide those services, resources, and facilities to students. Based on our review of the record, MSU did not breach its contractual duties regarding fees.

¶29 Because MSU kept its facilities open, maintained, or available for students to use in person or online, including its residence halls, dining services, library, computer labs, practice fields, parking lots, and fitness centers, we conclude Cordero is not entitled to a prorated refund of the mandatory fees he paid. MSU may have cautioned and encouraged

15

students to go home to their family residences, but it made accommodations for those students who chose to stay on campus, including keeping its campus operational so that students could progress and complete their academic programs. The express contract between Cordero and MSU provides no direct promise for access to on-campus activities, facilities, and equipment.

¶30 *2. Whether the District Court erred when it dismissed Cordero's implied contract claim under M. R. Civ. P. 12(b)(6).*

¶31 A contract is either express *or* implied. Section 28-2-103, MCA (emphasis added). "There cannot be an express and implied contract for the same thing existing at the same time. It is only when parties do not expressly agree that the law interposes and raises a promise. No agreement can be implied where there is an express one existing." *McNulty v. Bewley Corp.*, 182 Mont. 260, 265, 596 P.2d 474, 476 (1979) (citation omitted).

¶32 The District Court dismissed Cordero's implied contract claim under *Peretti v. Montana*, 238 Mont. 239, 777 P.2d 329 (1989). In *Peretti*, this Court found students were not entitled to an award of damages in a breach of implied contract action filed against the state because the state had sovereign immunity against implied contract cases. However, because we have determined above that an express contract exists between Cordero and MSU, we conclude that an implied contract cannot exist at the same time. Thus, we affirm the District Court's dismissal of Cordero's implied contract claim, but on different grounds. "[W]e will affirm a district court's decision when it reaches the correct result for the wrong reasons." *Kline*, ¶ 34, (citation omitted). Although the District Court concluded Cordero's implied contract claim was barred under a state sovereign immunity theory, its conclusion

16

that an implied contract claim must be dismissed under M. R. Civ. P. 12(b)(6) was the correct result. Accordingly, we need not address sovereign immunity on appeal.

¶33 *3. Whether the District Court erred when it dismissed Cordero's unjust enrichment claim under M. R. Civ. P. 12(b)(6).*

¶34 Unjust enrichment is the retention of a benefit conferred by another, without offering compensation, when compensation would reasonably be expected. *Owen v. Skramovsky*, 2013 MT 348, ¶ 25, 372 Mont. 531, 313 P.3d 205. Unjust enrichment is an equitable means of preventing one party from benefitting from his or her own wrongful acts. *Skramovsky*, ¶ 25. In the absence of a contract between the parties, unjust enrichment may create an implied contract between the parties. *Skramovsky*, ¶ 25. Under Montana law, a plaintiff may not recover under a theory of unjust enrichment if the parties' relationship is governed by a written contract. *Skramovsky*, ¶ 25.

¶35 As described above, we have determined there is an express, written contract between Cordero and MSU. Because the parties' relationship is governed by a contract, Cordero cannot plead an unjust enrichment claim as an alternative cause of action. Therefore, we affirm the District Court's dismissal of Cordero's unjust enrichment claim, but on different grounds. *Kline*, ¶ 34. We thus need not address the parties' arguments relating to Cordero's unjust enrichment claim.

## CONCLUSION

¶36 The District Court correctly granted summary judgment in favor of MSU over Cordero's breach of express contract claim. The court also correctly dismissed Cordero's implied contract and unjust enrichment claims under M. R. Civ. P. 12(b)(6).

17

¶37   Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JIM RICE